ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1124

---

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

JOHN DOE (Claimant #1),
Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION,
**Respondent.**

---

Petition for Review of a Final Order of the U.S. Securities and
Exchange Commission

---

BRIEF OF AMICUS CURIAE THE CENTER ON PRIVACY &
TECHNOLOGY AT GEORGETOWN LAW IN SUPPORT OF
PETITIONER

---

**Stephanie K. Glaberson**
Center on Privacy & Technology
Georgetown University Law Center
500 First St., NW
Washington, DC 20001
Tel: 202-662-9770
skg43@georgetown.edu
*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

**A. Parties and Amici.** Except for the amicus filing this brief, all parties, intervenors, and amici appearing before this Court are listed in the Petitioner's Brief. Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rules 26.1 and 29(a), undersigned counsel certifies that Center on Privacy & Technology is a nonprofit think tank located at Georgetown Law. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**B. Ruling Under Review.** References to the ruling at issue appear in the Brief for the Petitioner.

**C. Related Cases.** Counsel is aware of no related cases within the meaning of this Court's definition.

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson

i

## STATEMENT REGARDING SOURCE OF AUTHORITY TO FILE AND SEPARATE BRIEFING

Counsel for the parties consent to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), *amicus* certifies that a separate brief is necessary because *amicus* has specific expertise regarding corporate practices in the technology sector that other parties and amici are not be able to address. Because *amicus* is unaware of any other brief addressing these issues, *amicus* certifies that joinder into a single brief with other *amici* would be impracticable.

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for any party authored this brief in whole or in part and no entity or person, aside from the *amicus*, its members or its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson

ii

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES RULINGS UNDER REVIEW AND
RELATED CASES ……………………………………………………...………i

STATEMENT REGARDING SOURCE OF AUTHORITY TO FILE AND
SEPARATE BRIEFING……………………………………..………………………ii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS.……ii

TABLE OF CONTENTS……………………………………………………………iii

TABLE OF AUTHORITIES……………...…………………………………..v

GLOSSARY OF ABBREVIATIONS………...………………………………..xii

STATEMENT OF IDENTITY AND INTEREST IN CASE……………………1

STATUTES AND REGULATIONS..………………………………………...1

ARGUMENT…..………………………………………………………………...2

    A. Corporate tech is now central to most basic needs and civil and human
    rights disputes………………………………………..…………………..7

    B. Meaningful accountability is currently unavailable through mechanisms
    other than whistleblowing…………………………………………12

        1. Corporate secrecy……….………………………….………12

        2. Contractual control of worker speech…………………...……14

        3. Workplace surveillance…………………………………….……16

        4. Obstacles to public and media access……..……………..……17

    C. Tech whistleblowing is one of the most important tools the public
    has…………………………………………………………...…….18

1. Corporate employee whistleblowers have the greatest access to inside information……………………………………….…..18

2. Whistleblowers are even more crucial in the context of stymied legislative and regulatory action……………………….….......19

3. The threat of whistleblowing can have a deterrent effect………..21

4. Whistleblowing fosters oversight and the development of the law…………………………………………………………………..22

D. Potential corporate tech whistleblowers need clear, user-friendly incentive procedures to ensure vital information reaches the public………………………………………………………………24

CONCLUSION……………………………………………………………...27

CERTIFICATE OF COMPLIANCE…………………………………………...28

CERTIFICATE OF SERVICE……………………..…………………………..29

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aleksich v. Remington*,
No. 91-cv-00005-RFC (D. Mont.)…………………………………………14

*Brown & Williamson Tobacco Corp. v. F.T.C.*,
710 F.2d 1165 (6th Cir. 1983)……………………………………………...14

*Carpenter v. United States*,
585 U.S. 296 (2018)……………………………………………………7, 8

*In re IBM Arb. Agreement Litig.*,
76 F.4th 74 (2d Cir. 2023)…………………………………….........16

*In re Wells Fargo Mortg. Discrimination Litig.*,
No. 3:22-cv-00990-JD, Doc. 114 (N.D. Cal., Mar. 24, 2023)………………8

*People v. Wakefield*,
38 N.Y.3d 367 (2022)………………………………………….................13

*Rayner v. New York State Dep't of Corr. & Cmty. Supervision*,
197 N.Y.S.3d 463 (N.Y. Sup. Ct. 2023)……………………………...13

*State v. Loomis*,
881 N.W.2d 749 (2016)……………………………………………13

*Toe v. Cooper Tire and Rubber Co.*,
No. CL-106914 (Iowa Dist.)……………………………………........14

*United States v. Meta Platforms,
Inc.*, No. 1:22-cv-05187 (S.D.N.Y.)…………………………………9

*United States v. Realpage, Inc.*,
No.1:24-cv-00710 (M.D.N.C.)…………………………………………9

v

Material Under Seal Deleted

**Statutes & Regulations:**

75 Fed. Reg. 70488 (Nov. 17, 2010)……………………….……………….................22

15 U.S.C. § 78u–6……………………………………………………………....5, 26

Calif. S.B. 331……………………………………………………………………23

Dodd-Frank § 922(d)(1)……………………………………………………………26

**Other Authorities:**

Alexander J.S. Colvin, Econ. Pol'y Inst., *The Growing Use of Mandatory Arbitration* (2018)……………………………………………………………………..15-16

Alexander Dyck et al., *Who Blows the Whistle on Corporate Fraud?*, 65 J. Fin. 2213 (2010)…………………………………………….......4-5, 24, 25

Alexander Dyck et al., *Who Blows the Whistle on Corporate Fraud?*, National Bureau of Economic Research Working Paper 12882 (2007)…………………………………………………………………………18

████████████████████████████████████
████████████████████████████████████

Beth Gutelius & Sanjay Pinto, *Pain Points: Data on Work Intensity, Monitoring, and Health at Amazon Warehouses*, Ctr. for Urb. Econ. Develop. & Univ. of Ill.Chi, http://doi.org/10.25417/uic.24435124.v2……………………………….………10

Boris Babic et al., *Can AI Fairly Decide Who Gets an Organ Transplant?*, Harv. Bus. Rev. (Dec. 1, 2020), perma.cc/M3Q8-6CAU…………………………………………………….....11

Brian L. Schwalb, Att'y Gen. for D.C., Attorney General Schwalb Sues RealPage & Residential Landlords for Rental Price-Fixing, Illegally Raising Thousands of District Residents' Rents,

(Nov. 1, 2023)……………..……………………………………………...9

Brishen Rogers, Data and Democracy at Work: Advanced Information
 Technologies, Labor Law, and the New Working Class (2023)………..16-17

███████████████████████████████████████████████
███████████████████████████████████████████████

Center on Privacy & Technology, *Publications*,
 Geo. L., (last visited Nov. 11, 2024)…………………………...………1

Charlotte Garden, Econ. Pol'y Inst., *Was It Something I Said?: Legal Protections
 For Employee Speech* (2022)……………………………………………..14-15

Clare Garvie, *Garbage In, Garbage Out, Face Recognition on Flawed Data*,
 Ctr. on Priv. & Tech. at Geo. L. (May 6, 2019)…………………….…...11

*Digital Dystopia: The Danger in Buying What the Edtech Surveillance Industry Is
 Selling*, ACLU (2023)……………………………………………………...10

Elisse B. Walter, *Plans and prospects for financial regulatory reform*
 (April 23, 2010)………………………………………………………...21-22

Elizabeth Laird et al., *Hidden Harms: The Misleading Promise of Monitoring
 Students Online*, Ctr. For Democracy and Tech. (Aug. 2022)………………9

███████████████████████████████████████████████
███████████████████████████████████████████████

Gary Rhoades, *Ghosts in the Machine: How Past and Present Biases Haunt
 Algorithmic Tenant Screening Systems*, ABA (June 3, 2024),
 https://www.americanbar.org/groups/crsj/publications/human_rights_
 magazine_home/technology-and-the-law/algorithmic-tenant-screening-
 systems/……………………...........................................................................9

Material Under Seal Deleted

Geoffrey Christopher Rapp, *Four Signal Moments in Whistleblower Law:
1983-2013*, 30 Hofstra Lab. & Emp. L. J. 389 (2013)……………………..22

Geoffrey Christopher Rapp, *Mutiny by the Bounties? The Attempt to Reform Wall
Street by the New Whistleblower Provisions of the Dodd-Frank Act*,
2012 B.Y.U. L. Rev. 73 (2012)……………………………………………25

Geoffrey Christopher Rapp, *States of Pay: Emerging Trends in State
Whistleblower Bounty Schemes*, 54 S. Tex. L. Rev. 53 (2012)……………26

Hannah Bloch-Wehba, *The Promise and Perils of Tech Whistleblowing*, 118 Nw.
U. L. Rev. 1503 (2024)………………………...12, 14, 15, 17, 19, 20, 22, 23

████████████████████████████████████████

Jacob Goldstein, *To Increase Productivity, UPS Monitors Drivers' Every Move*,
NPR (Apr. 17, 2014), perma.cc/N3T7-FD6P……………………………10

John Harris, *'There was all sorts of toxic behaviour': Timnit Gebru on her sacking
by Google, AI's dangers and big tech's biases*,
The Guardian (May 22, 2023)……………………………………………..25

Julia Angwin et al., *Machine Bias*, ProPublica (May 23, 2016),
perma.cc/MJ58-5XPD…………………………………………………..…11

Julianne Pepitone, *Black, Female, and a Silicon Valley 'Trade Secret,'* CNN
(Mar. 18, 2013)…………………………………………………………..13

Julie E. Cohen, *Infrastructuring the Digital Public Sphere*,
25 Yale J.L. & Tech. 1 (2023)………………………………….…………7

Kashmir Hill, *Goodbye Big Five: I Tried to Block Amazon from My Life.
It Was Impossible*, Gizmodo (Jan. 22, 2019),
https://gizmodo.com/tech/ goodbye-big-five………………………………..2

Kashmir Hill, *I Tried to Live Without the Tech Giants. It Was Impossible*,

viii

Material Under Seal Deleted

N.Y. Times (July 31, 2020),
https://www.nytimes.com /2020/07/31/technology/blocking-the-tech-
giants.html………………………………………………………..…….2

Lauran Neergaard, *A biased test kept thousands of Black people
from getting a kidney transplant. It's finally changing*,
Associated Press  (Apr. 1, 2024),
https://apnews .com/article/kidney-transplant-race-black-inequity-bias-
d4fabf2f3a47aab2fe8e 18b2a5432135……………………………….…11

Meta Platforms Gross Profit 2010-2024, Macrotrends (last visited Oct. 3, 2024),
perma.cc/3TU6-8LRQ …………………………………………………..21

Miranda Bogen, *All the Ways Hiring Algorithms Can Introduce Bias*,
Harv. Bus. Rev. (May 7, 2019),
perma.cc/CLS8-TT2D …………………………………………...…10-11

*Mobile Fact Sheet*, Pew Rsch. Ctr. (Jan. 31, 2024),
https://www.pewresearch.org/ internet/fact-sheet/mobile/…………….........7

Myriam Gilles, *The Day Doctrine Died: Private Arbitration and the End of Law*,
2016 U. Ill. L. Rev. 371 (2016)……………………………………….…16

National Highway Traffic Safety Administration Enforcement Guidance Bulletin
2015-01: Recommended Best Practices for Protective Orders and Settlement
Agreements in Civil Litigation,
81 FR 13026-02………………………………………………….........14

Plan C & Women on Web, *Bings': Typo-Searching for Abortion*,
Repro Uncensored (May 1, 2024),
https://repro-uncensored.squarespace.com/research/bing……….................7-8

[redacted]

Rachel Arnow-Richman, *et al.*, *Supporting Market Accountability, Workplace
Equity, and Fair Competition by Reining in Non-Disclosure Agreements*,
Day One Project (2022)…………………………………………….…15

ix

Rebecca Crootof & B.J. Ard, *Structuring Techlaw*,
34 Harv. J.L. & Tech. 347 (2020)……………………………….........20

S. Rep. 111-176, 110 (2010)………………………………………………………18

SEC Order Determining Whistleblower Award Claims,
Rel. No. 97228,  File No. 2023-47 (Mar. 31, 2023)…………………………5

Sheridan Wall & Hilke Schellmann, *LinkedIn's job-matching AI was biased. The company's solution? More AI*, MIT Tech. Rev. (June 23, 2021),
perma.cc/V77R-B8UZ…………………………………………………..10

Shoshana Zuboff, The Age of Surveillance Capitalism (2019)…………………...19

Testimony of Myriam Gilles before the U.S. Sen. Committee on the Judiciary
(Apr. 8, 2024)…………………………………………………………………16

U.S. Dep't of Just., Civ. Rights Div., *Algorithms, Artificial Intelligence, and Disability Discrimination in Hiring* (May 12, 2022)………………………11

Zoë Schiffer, *Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information,*
The Verge (Sept. 9, 2021),
perma.cc/2EYP-B6PX……………………………………………....…25

x

# GLOSSARY OF ABBREVIATIONS

NDA        Non-disclosure agreement

SEC        U.S. Securities and Exchange Commission

## STATEMENT OF IDENTITY AND INTEREST IN CASE

The Center on Privacy & Technology at Georgetown Law (Privacy Center) is a think tank focused on privacy and surveillance law and policy. The Privacy Center conducts long-term investigations concerning the ways modern surveillance technologies expand the ability of the government and of corporations to monitor and track individuals. The Privacy Center has published several reports exposing the harms of digital era technologies, including face recognition, in the hands of law enforcement, the dragnet data practices of Immigration and Customs Enforcement, and the Department of Homeland Security's massive DNA-collection program. Center on Privacy & Technology, *Publications*, Geo. L., (last visited Nov. 11, 2024), perma.cc/T79X-UQ2X. The Privacy Center files this amicus brief to provide the Court with an understanding of the immense public interest in robust protections for whistleblowers in the technology sector.

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Brief for Petitioner.

1

## I.    ARGUMENT

In 2019, reporter Kashmir Hill embarked on an experiment: she sought to excise tech giants Amazon, Facebook, Google, Microsoft, and Apple from her life. Kashmir Hill, *Goodbye Big Five*, Gizmodo (2019), https://gizmodo.com/tech/goodbye-big-five. Hill had years of experience researching and writing about digital privacy, the resources of Gizmodo, and the support of technologist Dhruv Mehrotra backing her up. Mehrotra even built a customized "virtual private network" to aid her in her task. Kashmir Hill, *I Tried to Live Without the Tech Giants. It Was Impossible*, N.Y. Times (July 31, 2020), https://www.nytimes.com/2020/07/31/technology/blocking-the-tech-giants.html. Yet, Hill reports, the project was "impossible," "hell," and "devastating." *Id*.; Hill, *Goodbye Big Five*. For example, Hill's (failed) attempt to eliminate Amazon Web Services removed her access to vital channels of workplace communication and public library resources and cut off communication with her child's daycare provider, among other things. Kashmir Hill, *Goodbye Big Five: I Tried to Block Amazon from My Life. It Was Impossible*, Gizmodo (Jan. 22, 2019), perma.cc/UK9J-4ZGF.

As this experiment reveals, for most people today, avoiding corporate technology is all but impossible. Through the digital products which are their intellectual property, tech companies now mediate virtually every facet of modern

2

Material Under Seal Deleted

life, from how we communicate and obtain information, to how our children access basic education, to eligibility for basic human needs such as housing, food, and medical care, to what jobs we get and how we're treated at work. Tech companies exert overwhelming, often unavoidable, control, and continuously infringe on people's civil and human rights in the process.

For these reasons, it is more important than ever that people and their elected representatives—who have the power to make policy changes—have access to information about how these corporations and their tools work and the impact they have on our lives. But corporations, and especially the handful of corporations that hold monopolist power in the tech sector, devote considerable resources to a wide array of strategies for keeping that information from the public. By exploiting legal structures such as trade secret protections, worker contracts, workplace surveillance, and more, corporations dictate what information about them enters the public sphere.

In this context, whistleblowers like the claimant here play a more important role than ever. From Watergate to Archer Daniel Midland to Enron, and from the Pentagon Papers to Serpico and the NYPD, whistleblowers have illuminated some of the most historically significant instances of wrongdoing by powerful individuals and institutions. ███████████████████

3

Material Under Seal Deleted

██████████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

████████████████████████████████

██████████████████████████████

███████████████████████████

█████████████████████████████████

███████████████████████████

████████████████████████████████████

████████████████████

    But for the public to consistently benefit from whistleblowers' revelations, potential whistleblowers need strong, clear, and reliable incentives to come forward. Employees with knowledge of corporate wrongdoing face steep incentives to stay quiet: well-founded fears of professional, financial, social, and reputational repercussions and threats to their physical safety may keep many from coming forward. Alexander Dyck et al., *Who Blows the Whistle on Corporate*

4

*Fraud?*, 65 J. Fin. 2213, 2245 (2010) ("[t]he surprising part is not that most employees do not talk, but that some talk at all"). Whistleblower awards are supposed to act as the counterweight, providing a framework of protection and support for those who have first-hand knowledge of corporate practices that contradict the law or the public interest. But uncertainty as to whether awards will be available in the end undermines their efficacy. Here, the SEC denied ███████ award arguing that, despite going voluntarily to the news media to reveal the story, cooperating with the SEC and other U.S. and international government entities to support their investigations, and the SEC's admission that it opened its own investigation precisely because of the news reports in which ███████ a source, ███████ disclosures to the agency nevertheless were not "voluntary" because the agency reached out to ███ to request further information and an optional interview—based on the press pieces—before ██ reached out directly to them. SEC Order Determining Whistleblower Award Claims, Rel. No. 97228, File No. 2023-47 (Mar. 31, 2023). This interpretation of the governing law places the SEC's rules in conflict with general understandings of what is "voluntary" as well as Dodd-Frank, which specifically includes whistleblowers who go to the press among those due protections. 15 U.S.C. § 78u–6(a)(3)(C). And it risks undermining the whistleblower incentive program's goals, as it throws up unnecessary technical

5

Material Under Seal Deleted

barriers to recovery, turning the program from one that should be clear and easy to use into one that potential whistleblowers need a law degree to parse. If the decision stands, whistleblowers will be incentivized to hoard valuable information, making careful machinations about which federal agency to bring their information to and in what order so as best to guarantee an award in the end. Such strategy games risk leaving the public in the dark for months or even years, where public revelation, like that which occurred through ███████ work with the press, could instead protect the public interest and spur change, without impacting agency enforcement.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ Other potential whistleblowers will be watching what happens here. The SEC's decision risks discouraging them from speaking up and undermines the purpose of the SEC program. This Court should act to ensure the system continues to incentivize those with knowledge to come forward in the way that most benefits the public in each case.

6

**A. Corporate tech is now central to most basic needs and civil and human rights disputes.**

Our civil and human rights, rights to privacy, and access to basic needs all are being dictated by corporations. It is now virtually impossible to live in the U.S. without—wittingly or unwittingly—giving control over some aspect of one's existence to corporate dominance. Corporations and their technologies have taken on the quality of "infrastructure," undergirding the functioning of modern society. *See, e.g.,* Julie E. Cohen, *Infrastructuring the Digital Public Sphere*, 25 Yale J.L. & Tech. 1, 1 (2023).

Even the simple act of accessing information and communicating among ourselves is now practically impossible without a corporate intermediary. Cell phones have become "almost a 'feature of human anatomy,'" with "nearly three-quarters of smart phone users report[ing] being within five feet of their phones most of the time, [and] . . . 12% admitting that they even use their phones in the shower." *Carpenter v. United States*, 585 U.S. 296, 311 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385, 395 (2014)). For many, particularly those surviving on lower incomes, smartphones may be their only way to access the internet. *See Mobile Fact Sheet*, Pew Rsch. Ctr. (Jan. 31, 2024), https://www.pewresearch.org/internet/fact-sheet/mobile/. On that internet, corporations control what information we see and what we don't. *See, e.g.*, Plan C & Women on Web, *Bings': Typo-*

7

*Searching for Abortion*, Repro Uncensored (May 1, 2024), https://repro-

uncensored.squarespace.com/research/bing.

Similarly, financial life has long been impossible without going through a

corporate intermediary: "the decision whether to transact with banks and credit

card companies is no more or less voluntary than the decision whether to use a cell

phone. Today, . . . 'it is impossible to participate in the economic life of

contemporary society without'" doing so. *Carpenter*, 585 U.S. at 337 (Kennedy, J.,

dissenting) (quoting *United States v. Miller*, 425 U.S. 435, 451 (1976) (Brennan, J.,

dissenting)). These same institutions increasingly rely on proprietary (and often

discriminatory) algorithms to make decisions like who gets a mortgage or a small

business loan, which can have a profound and long-lasting impact on people's

lives. *See, e.g.*, *In re Wells Fargo Mortg. Discrimination Litig.*, No. 3:22-cv-

00990-JD, Doc. 114 (N.D. Cal., Mar. 24, 2023) (alleging mortgage lending

discrimination in large part through algorithmic tool).

Tech companies also exert considerable influence over the rental housing

market through algorithmic products that perpetuate longstanding discriminatory

patterns in who gets to live where. Technologies such as RealPage's rent-setting

algorithm and SafeRent's tenant screening algorithm, among others, are now the

subjects of suits alleging they allow landlords to artificially inflate rents or

8

disproportionately screen out minority applicants. *See, e.g.*, *United States v. Realpage, Inc.*, No.1:24-cv-00710 (M.D.N.C.); Gary Rhoades, *Ghosts in the Machine: How Past and Present Biases Haunt Algorithmic Tenant Screening Systems*, ABA (June 3, 2024), [https://www.americanbar.org/groups/crsj/](https://www.americanbar.org/groups/crsj/) [publications/human_rights_magazine_home/technology-and-the-law/algorithmic-](https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/technology-and-the-law/algorithmic-tenant-screening-systems/) [tenant-screening-systems/](https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/technology-and-the-law/algorithmic-tenant-screening-systems/); Brian L. Schwalb, Att'y Gen. for D.C., Attorney General Schwalb Sues RealPage & Residential Landlords for Rental Price-Fixing, Illegally Raising Thousands of District Residents' Rents, (Nov. 1, 2023). Corporate advertising algorithms may even determine the question of who receives information about available housing units by denying individuals opportunities to view housing advertisements because of their race, sex, or other protected characteristic. *See, e.g.*, *United States v. Meta Platforms, Inc.*, No. 1:22-cv-05187 (S.D.N.Y.).

Increasingly, students also cannot escape interactions with corporate tools. The vast majority of U.S. schools have begun providing students with internet-enabled devices such as tablets and laptops, with which students must engage to complete coursework. *See* Elizabeth Laird et al., *Hidden Harms: The Misleading Promise of Monitoring Students Online*, Ctr. For Democracy and Tech. 7-8 (Aug. 2022) (95% of teachers reported "their school or school district . . . provid[ed]

9

and/or maintain[ed] tablets and laptops for students to use at school, at home, or both"). These devices often come paired with tracking technologies. *See id.* (89% of teachers reported that "their school monitors student activity on school-issued and/or personal devices."); *Digital Dystopia: The Danger in Buying What the Edtech Surveillance Industry Is Selling*, ACLU 8 (2023), perma.cc/PA2V-HW6S.

Unsurprisingly, Americans also cannot escape corporate technology at work. Companies like Amazon and UPS use pervasive and invasive surveillance technologies in their workplaces. *E.g.*, Beth Gutelius & Sanjay Pinto, *Pain Points: Data on Work Intensity, Monitoring, and Health at Amazon Warehouses*, Ctr. for Urb. Econ. Develop. & Univ. of Ill. Chi. (2023), http://doi.org/10.25417/uic.24435124.v2; Jacob Goldstein, *To Increase Productivity, UPS Monitors Drivers' Every Move*, NPR (Apr. 17, 2014, 7:34 AM), perma.cc/N3T7-FD6P. But the influence of corporate-controlled technology starts before an individual even steps on the job site: Platforms like LinkedIn, ZipRecruiter, and CareerBuilder use proprietary (and, again, often discriminatory) algorithms to match potential candidates with job openings. *See, e.g.*, Sheridan Wall & Hilke Schellmann, *LinkedIn's job-matching AI was biased. The company's solution? More AI*, MIT Tech. Rev. (June 23, 2021), perma.cc/V77R-B8UZ; Miranda Bogen, *All the Ways Hiring Algorithms Can Introduce Bias*, Harv. Bus. Rev. (May 7, 2019),

10

perma.cc/CLS8-TT2D; U.S. Dep't of Just., Civ. Rights Div., *Algorithms, Artificial Intelligence, and Disability Discrimination in Hiring* (May 12, 2022).

We could go on. Healthcare providers increasingly use corporate-controlled algorithmic technologies to make medical decisions and insurance companies use similar technology to allow or deny coverage for care. *See, e.g.*, Lauran Neergaard, *A biased test kept thousands of Black people from getting a kidney transplant. It's finally changing*, Associated Press (Apr. 1, 2024, 11:00 PM), https://apnews .com/article/kidney-transplant-race-black-inequity-bias-d4fabf2f3a47aab2fe8e 18b2a5432135; Boris Babic et al., *Can AI Fairly Decide Who Gets an Organ Transplant?*, Harv. Bus. Rev. (Dec. 1, 2020), https://hbr.org/2020/12/can-ai-fairly-decide-who-gets-an-organ-transplant. Policing and prosecution regularly rely on flawed and racially biased corporate tech tools. *See, e.g.*, Clare Garvie, *Garbage In, Garbage Out, Face Recognition on Flawed Data*, Ctr. on Priv. & Tech. at Geo. L. (May 6, 2019), perma.cc/36U2-VMKQ; Julia Angwin et al., *Machine Bias*, ProPublica (May 23, 2016), perma.cc/MJ58-5XPD.

Tech companies design these products to maximize profits, but one way they maximize profits is by building dependency on their products into systems that are supposed to serve the common good. Healthcare, education, financial services, telecommunication – all of these industries are fundamental to basic human

11

thriving. And as those industries rely more and more heavily on the intellectual property of a handful of corporate tech giants, it becomes politically more difficult for policymakers to restrain the corporate practices that underly the production of the tech products.

## B. Meaningful accountability is currently unavailable through mechanisms other than whistleblowing.

In this corporate-controlled, tech-heavy context, access to information—about what these corporations and their tech are doing, who it all affects, and how—is necessary for people and their representatives to assert control. Yet corporations closely guard their secrets. The lack of an effective data governance regime has not only allowed corporately-controlled tech to creep into every area of life and infringe on civil rights, but has also led to inequities in information access.

### 1. Corporate secrecy.

The corporations that now control so much of our lives operate under a comfortable (for them) blanket of secrecy. Scholar Hannah Bloch-Wehba has argued that tech companies "have aggressively exploited trade secrecy and corporate confidentiality beyond ordinary expectations." Hannah Bloch-Wehba, *The Promise and Perils of Tech Whistleblowing*, 118 Nw. U. L. Rev. 1503, 1517 (2024).

12

Such trade secret claims hinder access to information in a variety of ways. First, they impede public records requests. *See, e.g.*, Julianne Pepitone, *Black, Female, and a Silicon Valley 'Trade Secret,'* CNN (Mar. 18, 2013) (tech companies' workforce diversity data provided to federal agencies "excluded [from disclosure] on the basis that doing so would cause 'competitive harm.'"); *Rayner v. New York State Dep't of Corr. & Cmty. Supervision*, 197 N.Y.S.3d 463, 470 (N.Y. Sup. Ct. 2023) ("the technology underlying COMPAS-NY is a bona fide trade secret belonging to equivant, and agency records containing such material are exempt from disclosure under" NY Freedom of Information Law).

Second, they stop defendants in criminal proceedings from accessing information about the tools employed against them at trial. *See, e.g.*, *State v. Loomis*, 881 N.W.2d 749, 761 (2016) (algorithmic risk assessment tool COMPAS was "a proprietary instrument and a trade secret" such that company could not be forced to "disclose how the risk scores are determined or how the factors are weighed"); *People v. Wakefield*, 38 N.Y.3d 367, 371, 387 (2022) (permitting introduction of "DNA mixture interpretation evidence generated by the TrueAllele Casework System" despite fact that TrueAllele's "source code and underlying algorithms were kept from independent evaluators and the defense as trade secrets").

13

In civil cases, too, trade secret claims obstruct a vital route through which the public often learns of corporate malfeasance. *See, e.g.*, *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983); National Highway Traffic Safety Administration Enforcement Guidance Bulletin 2015-01: Recommended Best Practices for Protective Orders and Settlement Agreements in Civil Litigation, 81 FR 13026-02. Too often, aggressive trade secret claims result in the imposition of restrictive protective orders on discovery material and the sealing of court records that could otherwise serve to alert the public to vital public safety threats. *See, e.g.*, *Toe v. Cooper Tire and Rubber Co.*, No. CL-106914 (Iowa Dist.); *Aleksich v. Remington*, No. 91-cv-00005-RFC (D. Mont.).

2. *Contractual control of worker speech.*

Corporations have many ways to control what employees can—and cannot—say about their employers. *See* Bloch-Wehba at 1518. U.S. law provides employers with generous leeway to discipline, punish, and even fire workers for speech, in part through the prevailing norm of "at-will" employment which allows employers "to impose any conditions of employment, to discharge an employee at any time for any reason, and to effect the discharge in virtually any manner." Charlotte Garden, Econ. Pol'y Inst., *Was It Something I Said?: Legal Protections For Employee Speech* 1 (2022) (quoting Mark Rothstein et al., Employment Law

14

Cases and Materials, 8th (2015)) (at-will employment the "default" in every state but Montana).

Not content with this immense power, corporations use their contracts with employees "to further restrict worker speech." Bloch-Wehba at 1519 (emphasis omitted). Two merit mention here: non-disclosure agreements ("NDAs") and arbitration clauses.

NDAs are prevalent in the U.S. workforce, particularly in the tech sector. While "between 33% and 57% of U.S. workers are constrained by an NDA or similar mechanism," a staggering "73% of workers in 'computer or mathematical jobs' report having an NDA." Rachel Arnow-Richman, *et al.*, *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining in Non-Disclosure Agreements*, Day One Project, 3 (2022). The true prevalence may be higher, as "NDAs often provide that the mere existence of the agreement is itself a secret." *Id.* NDAs constrain workers from revealing not only trade secrets or confidential commercial information but often apply broadly, restricting worker speech on "everything from workplace harassment and abuse to compensation practices and safety conditions." *Id.*

Likewise, arbitration agreements now pervade the U.S. workforce, with more than half of workers subject to mandatory arbitration. Alexander J.S. Colvin,

15

Econ. Pol'y Inst., *The Growing Use of Mandatory Arbitration* (2018). Arbitration clauses silence workers in at least two ways. First, they shield disputes from public view by forcing them out of court and into shadowy and confidential-by-contract arbitral halls. *See, e.g.*, *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 86 (2d Cir. 2023) (Federal Arbitration Act's "strong policy protecting the confidentiality of arbitral proceedings"); *see also* Myriam Gilles, *The Day Doctrine Died: Private Arbitration and the End of Law*, 2016 U. Ill. L. Rev. 371, 409-11 (2016) (arbitrators do not write decisions, explanations, or analyses; any information that becomes public reads "like a bloodless database of names (often redacted) and amounts (with no explanation or context)"). Second, arbitration clauses, often paired with class-action bans, appeal to corporations precisely because they make it harder, more expensive, and more intimidating to pursue individual claims at all. *See, e.g.*, Testimony of Myriam Gilles before the U.S. Sen. Committee on the Judiciary at 9, 16 (Apr. 8, 2024).

### 3. Workplace surveillance

Corporations increasingly subject their workers to totalizing surveillance, in which not only their on-site, work-day moves are tracked and traced, but their lives also become open books, even before they are hired. *See, e.g.*, Brishen Rogers, Data and Democracy at Work: Advanced Information Technologies, Labor Law,

16

and the New Working Class, 82-88 (2023). This surveillance has a chilling effect on worker speech, as watched workers feel inhibited in communicating concerns within the workplace. But the chilling effect—like the surveillance itself—also extends into workers' leisure hours. Unsurprisingly, it cuts off avenues of worker organizing, causing workers to fear participating in conversations and activities necessary for concerted action and unionization. And workplace surveillance may also short circuit formation of even the informal, casual relationships that are a necessary prerequisite to organizing.

### 4. Obstacles to public and media access.

Bloch-Wehba argues that a variety of legal regimes meant for other purposes also cut off public access to information about what goes on inside firms by making it harder for academics and journalists to get access to internal firm data. *See* Bloch-Wehba at 1523. The Computer Fraud and Abuse Act, for example, makes it "unlawful to 'access' and obtain 'information' from a 'protected computer' 'without authorization,'" effectively giving "online platforms discretion to grant or deny 'authorization' for access," backed up "with the force of criminal prosecution and civil liability." *Id.* Furthermore, "online platforms have argued that data protection law, including the General Data Protection Regulation, prevents them from disclosing." *Id.* at 1524.

17

*\*\*\**

So, while corporations and their technologies now wield unprecedented power, information about what they are up to, and what their tools actually do, has become harder for the public to access.

## C. Tech whistleblowing is one of the most important tools the public has.

Whistleblowers are therefore more important than ever. Tech workers hold the greatest access to information about what goes on inside these companies and how their technologies work; they are positioned to bring concrete, timely, and compelling stories to public light where they stand a chance of spurring real change; their potential presence inside tech firms serves to deter wrongdoing; and their accounts have the potential to foster oversight and legal developments that would be impossible otherwise.

*1. Corporate employee whistleblowers have the greatest access to inside information.*

To identify corporate wrongdoing, "it is often necessary to have access to information inside the firm." Alexander Dyck et al., *Who Blows the Whistle on Corporate Fraud?*, National Bureau of Economic Research Working Paper 12882, 24 (2007); S. Rep. 111-176, 110 (2010) ("whistleblower tips detected 54.1% of uncovered fraud schemes in public companies," compared to external auditors,

18

including the SEC, which uncovered "a mere 4.1%"). As the capabilities and complexities of digital products have increased, access to insider information and the knowledge with which to make it intelligible has become even more important.

Aside from the executives who are deeply invested in organizational secrecy, nobody has the kind of access to information about corporate practices and products that tech workers have. The revelation of corporate tech wrongdoing depends even more heavily on employee information than claims arising in other industries. The harms flowing from corporate technology not only lie behind the aggressively-protected walls of secrecy described above, but also often involve technical processes that outsiders may find difficult to parse. *See, e.g.*, Shoshana Zuboff, The Age of Surveillance Capitalism, 11 (2019). Inside information therefore is of the utmost importance.

2. *Whistleblowers are even more crucial in the context of stymied legislative and regulatory action.*

Lawmakers have thus far failed to keep pace with the tech sector's rabidly exploitative corporate practices. *See, e.g.*, Bloch-Wehba at 1515, 1548-49; Meg Leta Jones, *Does Technology Drive Law? The Dilemma of Technological Exceptionalism in Cyberlaw*, 2018 J.L. Tech. & Pol'y 249, 256 (2018). Law's lag behind the tech industry is not inevitable, but it does shape our current reality. *See,*

19

Material Under Seal Deleted

*e.g.*, Rebecca Crootof & B.J. Ard, *Structuring Techlaw*, 34 Harv. J.L. & Tech. 347, 355 (2020) ("law is not doomed to constantly scramble to keep up with technological change"); Jones, *Does Technology Drive Law?* at 256 ("By accepting the pacing problem and chasing new technologies with legal solutions, . . . policymakers[] unnecessarily accept a degree of irrelevance."); cf. Susie Alegre, *Regulators Are Finally Catching Up With Big Tech*, Wired (Jan. 12, 2024) https://www.wired.com/story/ regulators-are-finally-catching-up-with-big-tech/ (predicting—perhaps optimistically—that "we will see the regulatory void long enjoyed by Big Tech come to an end"). Whistleblowing is crucial in this context for two reasons. First, it can provoke what Bloch-Wehba describes as "'fire alarm' oversight[,] in which third parties alert lawmakers to an issue of concern, prompting scrutiny." Bloch-Wehba at 1548. And second, it is one of the only mechanisms currently available to help create the discursive space and political will to spur further future change.

Both outcomes of whistleblowing were on display here. ████████████

████████████████████████████████████████████

████████████ ████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

20

Material Under Seal Deleted

 This increased public understanding and the conversations it makes possible are the necessary prerequisite to changing the current state of play, in which the industry wields outsize power and the political community largely stands by.

   3. *The threat of whistleblowing can have a deterrent effect.*

   After-the-fact accountability is only one piece of the puzzle. Also important is the deterrent effect of whistleblowing. *See, e.g.*, Elisse B. Walter, *Plans and prospects for financial regulatory reform* (April 23, 2010),

   21

Material Under Seal Deleted

https://www.sec.gov/news/speech/2010/ spch042310ebw.htm (describing

legislation as improving SEC "ability to . . . *deter wrongdoing*" (emphasis added));

75 Fed. Reg. 70488, 70489 (Nov. 17, 2010) (emphasizing deterrent effect of

whistleblower scheme). The clear availability of incentives to blow the whistle

externally not only encourages firms to be more careful to do the right thing, but

also may improve internal reporting and accountability procedures "by introducing

competitive pressure" on firms to ensure they have a chance to address issues

internally before facing penalties. Geoffrey Christopher Rapp, *Four Signal

Moments in Whistleblower Law: 1983-2013*, 30 Hofstra Lab. & Emp. L. J. 389,

399 (2013).

   4. *Whistleblowing fosters oversight and the development of the law.*

Ensuring that whistleblowers have multiple, clear avenues for getting their

information out fosters "timely, concrete, and actionable" legislative oversight and

lawmaking. Bloch-Wehba at 1549. Again, this case is a prime example. ████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

22

Material Under Seal Deleted



Material Under Seal Deleted

If potential whistleblowers like these were instead incentivized to constrain their information to the SEC for fear of undermining claims to an award, as upholding the SEC's decision here risks, the public would lose out on a vital mechanism for spurring change.

### D. Potential corporate tech whistleblowers need clear, user-friendly incentive procedures to ensure vital information reaches the public.

Despite the immense public interest in the revelation of potential corporate tech whistleblowers' information, they face myriad risks and disincentives to come forward. "[T]he surprising part," about whistleblowing, one set of researchers noted, "is not that most employees do not talk, but that some talk at all." Alexander Dyck et al., *Who Blows the Whistle on Corporate Fraud?*, 65 J. Fin. 2213, 2245 (2010). It is therefore vital that those considering blowing the whistle have faith there will be a reward on the other end. The SEC's overly restrictive view of ██████ case here is thus not only contrary to law and common understanding, but also likely to disincentivize others from coming forward. The public has never needed the information tech whistleblowers hold as much as we do today. This Court should act to ensure we continue to hear it.

Whistleblowers face huge financial, social, and reputational costs, and some even face threats to their physical safety. To start, put "bluntly: 'Most

24

Material Under Seal Deleted

whistleblowers are fired.'" Geoffrey Christopher Rapp, *Mutiny by the Bounties? The Attempt to Reform Wall Street by the New Whistleblower Provisions of the Dodd-Frank Act*, 2012 B.Y.U. L. Rev. 73, 113 (2012) (quoting C. Fred Alford, *Whistle-Blower Narratives: The Experience of Choiceless Choice*, 74 Soc. Rsch. 223, 223 (2007)). One study found that "in 82% of the cases, the whistleblower was fired, quit under duress, or had significantly altered responsibilities." Dyck (2010) at 2240. ██████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████ Many have trouble finding work in their chosen industry thereafter, compelling "many employee whistleblowers . . . to move to another industry and often to another town to escape personal harassment." Dyck (2010) at 2240-45. Some, ████████████████ ██████████████ experience serious threats to their physical safety, forcing them out of their own homes and into hiding. ███████████████████

████████████████████████████████████

█████████████████████████████████████████

25

Even those who fare well in the end must endure years of uncertainty and, often, crushing legal fees as their cases work toward resolution.

Whistleblower award programs can help to "correct the resulting imbalance." Geoffrey Christopher Rapp, *States of Pay: Emerging Trends in State Whistleblower Bounty Schemes*, 54 S. Tex. L. Rev. 53, 59 (2012). But they can only do so if potential whistleblowers trust the incentives will indeed be available at the end of the day. For this reason, Congress specified that the Dodd-Frank program should be "clearly defined and user friendly." Dodd-Frank § 922(d)(1). Whistleblowers should be incentivized to get their information to the public as quickly and clearly as possible—not to engage in careful machinations to report in sequential order so as best to preserve future chances of recovery. Yet the SEC's decision here undermines that goal. Instead of operating consistent with Dodd-Frank's mandate and extension of protections to press whistleblowers (*see* 15 U.S.C. § 78u–6(a)(3)(C)), the SEC's decision places the agency's rules in conflict with the statute and artificially limits the mechanisms potential whistleblowers have to make disclosures with a chance of recovery. The result will be fewer disclosures and an impoverished public conversation.

26

## CONCLUSION

This case is not just about the Petitioner, but about the thousands of tech workers holding valuable information about the inner workings of powerful corporations, watching and gauging the risks and potential rewards of speaking up. They need to know there are real incentives to doing so. Otherwise, we risk remaining in the dark about the details of what corporate tech is up to, even as the industry and its tools insinuate their way into more and more of our lives. For the foregoing reasons, we urge this Court to rule in favor of the Petitioner in this case.

Respectfully Submitted,

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson
Center on Privacy & Technology
Georgetown Univ. Law Center
500 First St., N.W.
Washington, D.C.  20001
(202) 662-9770
*Counsel for Amicus Curiae*

November 29, 2024

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App.

P. 29(a)(5) because it does not exceed 6,500 words, excluding the items

listed in Fed. R. App. P. 32(f).

Respectfully Submitted,

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson
Center on Privacy & Technology
Georgetown Univ. Law Center
500 First St., N.W.
Washington, D.C.  20001
(202) 662-9770
*Counsel for Amicus Curiae*

November 29, 2024

28

## CERTIFICATE OF SERVICE

I, Stephanie K. Glaberson, certify that on November 29, 2024, a copy of the

Public Copy of the Brief of Amicus Curiae was served via the Court's ECF system

on:

Stephen Martin Kohn
David Keith Colapinto
Kayla Max Svihovec
*Kohn, Kohn & Colapinto, LLP*
1710 N Street, NW
Washington, DC 20036
Business: 202-342-6980

Emily True Parise, Attorney
*U.S. Securities and Exchange Commission*
100 F Street, NE
Washington, DC 20549
Personal: 202-551-5169

Respectfully Submitted,

*/s/ Stephanie Glaberson*
Stephanie K. Glaberson
Center on Privacy & Technology
Georgetown Univ. Law Center
500 First St., N.W.
Washington, D.C.  20001
(202) 662-9770
*Counsel for Amicus Curiae*

November 29, 2024

29