**Case No. 23-1124**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————___

DOE, an individual,

*Petitioner-Appellant*,

– v. –

SECURITIES AND EXCHANGE COMMISSION,

*Respondent-Appellee.*

_____

On Petition for Review of a Final Order of
The U.S. Securities and Exchange Commission

**BRIEF OF *AMICI CURIAE* THE SIGNALS NETWORK,
ERIKA CHEUNG, JANE TURNER, LAWRENCE LESSIG,
SHERRON WATKINS, AND AARON WESTRICK
IN SUPPORT OF PETITIONER-APPELLANT**

Margaux Ewen
The Signals Network, Inc.
268 Bush St #4216,
San Francisco, CA 94104
(917) 213-3028
info@thesignalsnetwork.org

*Counsel for Amici*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Amici Curiae's counsel makes the following certifications as to parties, rulings and related cases.

**(A)     Parties and Amici**

All parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner.

**(B)     Rulings Under Review**

References to rulings at issue appear in the Brief for Petitioner.

**(C)     Related Cases**

There are no related cases currently pending in this or another court that counsel is aware of as contemplated by D.C. Circuit Rule 28(a)(1)(C).


Dated this 3rd day of December 2024.

By: /s/ Margaux Ewen
Margaux Ewen
Admitted to NY Bar and DC Circuit
Court of Appeals

The Signals Network
268 Bush St #4216,
San Francisco, CA 94104
(917) 213-3028

*Counsel for Amici Curiae*

i

## FRAP 26.1 DISCLOSURE

The undersigned counsel of record certifies that the following are persons and entities as described in FRAP 26.1(a) and must be disclosed. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

The Signals Network ("TSN") is a nonprofit organization. No publicly traded company owns more than 10% of its stock.

Amici Curiae are represented by Margaux Ewen the Whistleblower Protection Program Director at TSN.

Dated this 3rd day of December 2024.

By: /s/ Margaux Ewen
Margaux Ewen
Admitted to NY Bar and DC Circuit Court of Appeals

The Signals Network
268 Bush St #4216,
San Francisco, CA 94104
(917) 213-3028

*Counsel for Amici Curiae*

ii

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ………... i

FRAP 26.1 DISCLOSURE …………………………………………………….. ii

TABLE OF CONTENTS ……………………………………………………… iii

TABLE OF AUTHORITIES ……………………………………………… v

GLOSSARY ……………………………………………………………….. viii

INTEREST OF *AMICI CURIAE* ………………………………………………… 1

SUMMARY OF ARGUMENT ……………………………………………… 5

ARGUMENT ………………………………………………………………... 8

  I. THE IMPACT OF WHISTLEBLOWERS' INFORMATION ON
     THE PUBLIC CANNOT BE OVERLOOKED NOR CAN THE
     RISK TO WHISTLEBLOWERS' SAFETY AND WELLBEING ………….. 8

  A. The Public Benefit Attributable to Information Disclosed by
     Whistleblowers is Substantial …………………………………………… 8

  B. Whistleblowers Face Significant Personal Harm as a Consequence
     of Their Revelations ……………………………………………………... 9

  II. THE DIVISION OF ENFORCEMENT'S ENFORCEMENT
      MANUAL ACKNOWLEDGES THE IMPORTANCE OF THE
      PRESS IN THEIR MUI PROCESS WHICH DEPENDS ON
      ORIGINAL INFORMATION FROM WHISTLEBLOWERS ………….... 14

  A. Congress's Intent Behind the Dodd-Frank Rewards Programs
     Reveals They Understood Whistleblowers Are Not Experts in
     Regulatory Law …………………………………………………………… 14

  B. Amici's Insights on Whistleblowers Underscores Whistleblowers
     Lack Awareness of Programs Designed to Aid Them …………………… 15

i. The Firsthand Experience of Amici as Whistleblowers Reveals Unfamiliarity with the Legal System Common to Whistleblowers …………………………………………….. 16

C. The Enforcement Manual Instructs Staff to Rely on Investigative Journalists and, Thus, on Information Disclosed by Whistleblowers, Who Are Therefore Essential to the Commission's Ability to Properly Investigate Wrongdoing …………….. 19

III. DOE MEETS THE REQUIREMENTS FOR A §36(A) WAIVER BECAUSE THE EXEMPTION IS NECESSARY FOR THE PUBLIC INTEREST AND THE PROTECTION OF INVESTORS ……. 23

CONCLUSION …………………………………………………….. 26

CERTIFICATE OF COMPLIANCE ………………………………….. 28

CERTIFICATE OF SERVICE …………………………………… 29

iv

# TABLE OF AUTHORITIES

**Page(s)**

## STATUTES

5 U.S.C. § 78mm(a)(1). …………………………………………………………. 23

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1276 (2010) …………………………………… 5

## LEGISLATIVE MATERIALS

Floor Statement of Sen. Grassley, 162 *Congressional Record* (Dec. 9, 2016) ……. 3

Government Accountability Office, *Timeline of US Whistleblowers* ………………. 9

Government Accountability Office, *Whistleblower Protection: Additional Actions Needed to Improve DOJ's Handling of Retaliation Complaints* (GAO 15-112) (Jan. 2015) ……………………………………………………. 3

Office of Whistleblower Ombuds, *Whistleblowing and Mental Health* …………. 12

SEC Off. of Whistleblower Ann. Rep. to Cong. FY 2023 (Nov. 14, 2023) ………. 7

SEC Off. of Whistleblower Ann. Rep. to Cong. FY 2024 (Nov. 15, 2024) …. 6, 7, 8

VALID Act of 2023, H.R. 2369, 118th Cong (2023) ……………………………… 19

## OTHER AUTHORITIES

A Right to Warn about Advanced Artificial Intelligence (June 4, 2024) …………... 2

*Anti-Corruption and Integrity Outlook 2024*,
OECD (2024) ……………………………………………………………… 20

SEC Enforcement Manual,
Division of Enforcement Office of Chief Counsel (Nov. 28, 2017) ……… 20, 22

David Lewis & Wim Vandekerckhove, *Developments in Whistleblowing Research 2015*,
INT'L WHISTLEBLOWING RSCH. NETWORK (2015) …………………………….. 10

Govt. Corr. Opp. to Mot. to Exclude Anecdotal Test Results, *U.S. v. Holmes*,
18-CR-00258 EJD (Dist. Ct. N.D. Cal. San Jose Div., Cal.) (Mar. 23, 2021) ... 17

Jean Lennane, *What Happens to Whistleblowers, and Why?*
6 SOCIAL MEDICINE 249 (2012) ……………………………………………… 10

Joyce Rothschild & Terance D. Miethe, *Whistle-Blower Disclosures and Management Retaliation: The Battle to Control Information about Organization Corruption*,
26 WORK AND OCCUPATIONS 107 (1999) ……………………………………. 10

Kevin Rose, *OpenAI Insiders Warn of a 'Reckless' Race for Dominance*,
N.Y. TIMES (June 4, 2024) ……………………………………………………. 2

National Whistleblower Center, *Recognizing Whistleblowers* …………………… 9

Sherron S. Watkins, Former VP, Enron, Comment Letter on Petition for Issuance, Amendment or Repeal of Commission Rules Related to Whistleblower Submission of Original Information to the News Media
(Apr. 5, 2022) ……………………………………………………………… 4

Peter G. van der Velden, Mauro Pecoraro, Mijke S. Houwerzijl, & Erik van der Meulen, *Mental Health Problems Among Whistleblowers: A Comparative Study*,
122 PSYCHOLOGICAL REPORTS 632 (2019) ……………………………… 10

Press Release, AG Mark Brnovich, AG Brnovich Obtains $4.65 Million for Arizonans Who Purchased Theranos Blood Tests (Apr. 18, 2017) ……………. 17

Solcyré Burga, *Employees Say OpenAI and Google DeepMind Are Hiding Dangers from the Public*,
TIME (June 4, 2024) …………………………………………………………. 2

*The Role of the Media and Investigative Journalism in Combating Corruption*,
OECD (2018) ………………………………………………………………. 21

Theo Nyreröd & Giancarlo Spagnolo, *A Fresh Look at Whistleblower Rewards* Stockholm Institute of Transition Economics, Working Paper No. 56
(June 2021) ………………………………………………………………. 16

Theo Nyreröd & Giancarlo Spagnolo, *Myths and Numbers on Whistleblower Rewards* Stockholm Institute of Transition Economics,
Working Paper No. 44 (Dec. 2017) ………………………………………… 9

Will Knight, *OpenAI Employees Warn of a Culture of Risk and Retaliation*,
WIRED (June 4, 2024) ………………………………………………………. 2

*Whistleblower Stories: 12 Inspiring Individuals Who Safeguarded Public Interest by Exposing Misconduct*, TRANSPARENCY INT'L (June 23, 2023) ……… 9

# GLOSSARY

| | |
|---|---|
| AI | Artificial Intelligence |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1276 (2010) |
| DOJ | Department of Justice |
| FDA | Food and Drug Administration |
| MUI | Matter Under Inquiry |
| NDA | Non-Disclosure Agreement |
| OECD | Organisation of Economic Development |
| SEC | Securities and Exchange Commission |
| TSN | The Signals Network |

# INTEREST OF *AMICI CURIAE*[1]

The Signals Network ("TSN"), Inc. is a 501(c)3 registered nonpartisan, nonprofit organization that provides legal, psychological, security, communications, and advocacy support to individuals who have shared information of public interest. TSN often supports individuals who have worked directly with the media, either publicly or anonymously, to share information of potential wrongdoing. TSN works closely with journalists and their sources to ensure their sources are protected from the retaliation that often comes from speaking out.

Since its founding in 2017, TSN has provided support to hundreds of individuals who have shared vital information of wrongdoing with the press across five continents. These whistleblowers have shared some of the most important stories of wrongdoing to emerge over the last six years, and they have suffered significant repercussions because of their respective decisions to speak out.

Erika Cheung is a former employee of Theranos, Inc. the Silicon Valley startup that claimed to have revolutionized blood testing. Ms. Cheung, along with other former employees, was a key whistleblower in reporting Theranos's fraudulent business practices to the media and, ultimately, to health regulators. Ms. Cheung's whistleblowing subsequently led to the shutdown of Theranos' clinical laboratory,

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel provided money for this brief; and no one other than *amici* have contributed money for this brief.

1

which prevented the company from providing further false medical results to thousands of patients. Since blowing the whistle on Theranos, Ms. Cheung has advocated for whistleblowers and ethical scientific practices, founding and acting as Executive Director of Ethics in Entrepreneurship as well as serving as an advisor to TSN.

Lawrence Lessig is the Roy L. Furman Professor of Law and Leadership at Harvard Law School. Prior to teaching at Harvard, Mr. Lessig taught at Stanford Law School, where he founded the Center for Internet and Society. Mr. Lessig represents whistleblowers from OpenAI and Google DeepMind on a pro bono basis. These whistleblowers disclosed the potential risks of artificial intelligence ("AI") and revealed they were required to sign NDAs that violated several laws in an open letter to the New York Times and other news media outlets.[2] According to the SEC's argument here, these whistleblowers would have lost their rights under Dodd-Frank if any government agency had contacted them before they became aware of their rights.

---

[2] A Right to Warn about Advanced Artificial Intelligence, (June 4, 2024), https://righttowarn.ai/; Kevin Rose, *OpenAI Insiders Warn of a 'Reckless' Race for Dominance*, N.Y. TIMES, (June 4, 2024), https://www.nytimes.com/2024/06/04/technology/openai-culture-whistleblowers.html; Will Knight, *OpenAI Employees Warn of a Culture of Risk and Retaliation*, WIRED, (June 4, 2024), https://www.wired.com/story/openai-right-to-warn-open-letter-ai-risk/; Solcyré Burga, *Employees Say OpenAI and Google DeepMind Are Hiding Dangers From the Public*, TIME, (June 4, 2024), https://time.com/6985504/openai-google-deepmind-employees-letter/.

Jane Turner is a highly decorated, twenty-five-year veteran Special Agent with the FBI. She served in the most difficult investigatory positions and was the first women named as the head of an FBI resident agency. Ms. Turner's career ended when she blew the whistle disclosing that her colleagues had stolen items from Ground Zero after the September 11, 2001 terrorist attacks.[3] Ms. Turner's allegations were widely reported in the news media. Following her disclosures, the Deputy Attorney General ruled that Ms. Turner was subject to illegal retaliation. Her case ultimately helped trigger legislation to improve the rights of FBI whistleblowers.[4] Ms. Turner is also a member of the National Whistleblower Center Board of Directors.

Sherron Watkins was the Vice President of the publicly traded company, the Enron Corp. In 2001, Ms. Watkins discovered a massive accounting fraud scheme in which Enron was misleading shareholders and the board of directors by hiding billions of dollars. Ms. Watkins blew the whistle on Enron's fraud and was named Time Magazine Person of the Year in 2002, along with two other whistleblowers, in recognition of her whistleblowing. Ms. Watkins' personal experience blowing the whistle, her discussions with numerous whistleblowers, and her advocacy over the

---

[3] Government Accountability Office, *Whistleblower Protection: Additional Actions Needed to Improve DOJ's Handling of Retaliation Complaints* (GAO 15-112) (Jan. 2015), *available at* https://www.gao.gov/assets/d15112.pdf.

[4] Floor Statement of Sen. Grassley, 162 *Congressional Record,* p. S. 7128 (Dec. 9, 2016), *available at* https://www.govinfo.gov/content/pkg/CREC-2016-12-09/html/CREC-2016-12-09-pt1-PgS7130-5.htm.

past two decades has made clear to her the positive impact the media has on protecting investors and serving the public interest.[5]

Aaron Westrick is a former police officer, a Professor at Lake Superior State University, and a member of the National Whistleblower Center's Leadership Counsel. While working for the largest body armor company in the United States, Dr. Westrick blew the whistle on defective bulletproof vests being sold nationwide to police officers and military personnel. Dr. Westrick's insider information documenting the defects in the vests was given to the media by the victims of the vest-malfunctions resulting in Congressional and governmental investigations. Dr. Westrick successfully filed a False Claims Act lawsuit, triggering additional investigations and recoveries of over $132 million from numerous companies and the transfer of over $22 million to pay for new vests for police officers.[6]

TSN has an interest in this case as protecting and ensuring proper governmental support for whistleblowers is critical to the organization's mission. TSN hopes to ensure the Court's resolution of this case does not create significant harm for future whistleblowers that the organization will either directly represent or that is at odds with the organization's mission in protecting the best interests of

---

[5] *See* Sherron S. Watkins, Former VP, Enron, Comment Letter on Petition for Issuance, Amendment or Repeal of Commission Rules Related to Whistleblower Submission of Original Information to the News Media (Apr. 5, 2022), *available at* https://www.sec.gov/comments/4-783/4783-20123629-279722.pdf

[6] *See* www.westrickphd.com

whistleblowers. Additionally, individual amici listed in this brief—as former whistleblowers, counsel to whistleblowers, and board members and advisors to whistleblower-centered organizations have an interest in this case as their advocacy hinges on the protection of whistleblowers.

Pursuant to D.C. Circuit Rule 29(d), this separate brief for amici curiae is necessary and could not be filed with the amici included in other briefs for this case. Amici included here can speak directly to the interests of whistleblowers and can provide information to the Court on specific harms experienced by whistleblowers in a way other amici are not able to address. TSN—as a whistleblower protection organization—and Mr. Lessig—as an attorney providing pro bono representation to whistleblowers—are able to provide background to the dangers they have seen whistleblowers face. Additionally, Ms. Cheung, Ms. Turner, Ms. Watkins, and Dr. Westrick—as former whistleblowers—can provide firsthand knowledge of whistleblowing that is critical to this case.

## SUMMARY OF ARGUMENT

Whistleblowers inform and protect the public from abuse by officials in power. The United States—and the Securities and Exchange Commission ("the Commission") in particular—has admirably reciprocated that protection. Whistleblowing has flourished since the Commission commenced its whistleblower rewards programs under the Dodd-Frank Wall Street Reform and Consumer

Protection Act ("Dodd-Frank"). Respondents are asking this Court to backtrack on the Congressional promise to support and protect whistleblowers and their interests. This promise—made in acknowledgement of the personal harm whistleblowers undergo for the benefit of the American public—is bedrock of the Dodd-Frank rewards program. Respondents ask this Court to punish whistleblowers—and ignore the Commission's very own internal precedent—for failing to have a robust understanding of U.S. securities regulations and laws when whistleblowers choose to first report misconduct to the media before regulators. This cannot stand.

Freedom of the press is at the core of a functioning democracy. It is a fundamental American value. Whistleblowers recognize the power of the press and choose to disclose wrongdoing accordingly because they know making information public via the press benefits the good of all people. The protection and support of whistleblowers who disclose information to the press is therefore critical to the proper functioning of U.S. regulators, such as the Commission.

This case presents serious questions about the Commission's evaluation of Dodd-Frank awards to whistleblowers who risk their careers, financial security, and mental and physical health to bring forward critical information. Whistleblowing has directly resulted in the Commission's recovery of billions of dollars in monetary sanctions, benefiting investors and U.S. taxpayers thanks to Dodd-Frank. Since the rewards program was introduced in 2011, the Commission has recovered more than

6

$7 billion thanks to whistleblower tips. SEC Off. of Whistleblower Ann. Rep. to Cong. FY 2024 (Nov. 15, 2024), *available at* https://www.sec.gov/files/fy24-annual-whistleblower-report.pdf. In Fiscal Year 2024, the Commission granted 28 awards leading to millions of dollars in sanctions against the involved entities and individuals. *Id* at 3. Additionally, more than $250 million was deposited into the Investor Protection Fund financed entirely from monetary sanctions stemming from whistleblowers' tips; in Fiscal Year 2023, almost $650 million was deposited into the Investor Protection fund. *Id* at 12-13; SEC Off. of Whistleblower Ann. Rep. to Cong. FY 2023 at 8-9 (Nov. 14, 2023), *available at* https://www.sec.gov/files/fy23-annual-report.pdf.

Amici write to highlight the dangers of the Commission's denial of Petitioner Doe's whistleblower claim based on their misreading of Dodd-Frank, specifically the definition of "voluntary" and "original source." The Commission's denial is (1) inconsistent with Congress's definition of "original source," (2) inconsistent with the Commission's own enforcement manual, and (3) inconsistent with the Commission's past application of Section 36 the Securities Exchange Act of 1934.

Ultimately, a ruling against Doe will harm the Commission, investors of the corporation involved in this instance of misconduct, and U.S. taxpayers. A ruling against Doe will decrease the protections and incentives put in place, which are essential to countering the harms nearly all whistleblowers face when they risk their

own wellbeing and livelihoods to bring forth information critical to holding these corporations accountable to the law. As such, amici write to highlight the harms of upholding Commission's internal decision in the administrative proceeding being appealed. Amici seek to apprise the Court of relevant facts and statistics that TSN has collected through the organization's work with hundreds of whistleblowers and the experiences Ms. Cheung, Ms. Turner, Ms. Watkins, and Dr. Westrick have witnessed, both personally—as whistleblowers—and through their advocacy efforts working with and on behalf of other whistleblowers.

## **ARGUMENT**

**I. THE IMPACT OF WHISTLEBLOWERS' INFORMATION ON THE PUBLIC CANNOT BE OVERLOOKED NOR CAN THE RISK TO WHISTLEBLOWERS' SAFETY AND WELLBEING.**

### **A. The Public Benefit Attributable to Information Disclosed by Whistleblowers is Substantial.**

Enforcement actions brought as a result of whistleblower-released information have resulted in orders for more than $7 billion in total monetary sanctions leading to billions of dollars returned to harmed investors. SEC Off. of Whistleblower Ann. Rep. to Cong. FY 2024. Beyond the financial interests protected by whistleblowers' disclosures, whistleblowers have an enormous impact on public interest and safety across the globe through the revelations they bring to light. *See, e.g.*, *Whistleblower Stories: 12 Inspiring Individuals Who Safeguarded Public Interest by Exposing Misconduct*, TRANSPARENCY INT'L, June 23, 2023.

In the United States alone, whistleblowers have time and time again revealed information of immense public interest in order to inform and protect American citizens. *See, e.g.*, Government Accountability Office, *Timeline of US Whistleblowers*, *available at* https://whistleblower.org/timeline-us-whistleblowers/; National Whistleblower Center, *Recognizing Whistleblowers*, *available at* https://www.whistleblowers.org/members_categories/meet-whistleblowers/.

The American people—and people throughout the world—are better off thanks to disclosures made by whistleblowers. Importantly, "the available evidence consistently suggests that a well-designed and administered reward program will likely increase the quantity and quality of disclosures received by regulators." Theo Nyreröd & Giancarlo Spagnolo, *Myths and Numbers on Whistleblower Rewards* (Stockholm Institute of Transition Economics, Working Paper No. 44, Dec. 2017).

### B. Individuals Face Significant Personal Harm as a Consequence of Their Whistleblowing.

Despite the clear positive impact whistleblowers have made, their public service nearly always comes at a staggering personal cost. Numerous studies have shown the marked financial, emotional, and health-related effects whistleblowers experience. *See, e.g.*, Jean Lennane, *What Happens to Whistleblowers, and Why?* 6 SOCIAL MEDICINE 249 (2012) (research finding that the repercussions of whistleblowing on mental health results in isolation, removal of normal work, denigration, demanding or impossible orders and referral for psychiatric assessment

9

leading to many whistleblowers losing their jobs and homes, facing expensive lawsuits, divorce, alcohol abuse, attempted suicide, and bankruptcy); David Lewis & Wim Vandekerckhove, *Developments in Whistleblowing Research 2015*, INT'L WHISTLEBLOWING RSCH. NETWORK at 116 (2015), *available at* https://gala.gre.ac.uk/id/eprint/14461/4/14461_VANDEKERCKHOVE_Developm ents_in_Whistleblowing_Research_2015.pdf ("In  summarizing our findings, we can see [] that mental health struggles are pervasive, almost ubiquitous, in whistleblowers' stories"); Joyce Rothschild & Terance D. Miethe, *Whistle-Blower Disclosures and Management Retaliation: The Battle to Control Information about Organization Corruption*, 26 WORK AND OCCUPATIONS 107 (1999) (nationwide data showing the following prevalence of mental health problems among whistleblowers with different backgrounds: severe depression or anxiety (symptoms), 84%; feelings of isolation or powerlessness, 84%; distrust of others, 78%; declining physical health, 69%; severe financial decline, 66%; and problems with family relations, 53%); Peter G. van der Velden, Mauro Pecoraro, Mijke S. Houwerzijl, & Erik van der Meulen, *Mental Health Problems Among Whistleblowers: A Comparative Study*, 122 PSYCHOLOGICAL REPORTS 632 (2019) ("About 85% [of the whistleblowers included] suffered from severe to very severe anxiety, depression, interpersonal sensitivity and distrust, agoraphobia symptoms, and/or sleeping problems… These specific mental health problems were much more prevalent than among the general

10

population."). The detrimental impacts of whistleblowing on individuals extends to their families as well; one study of healthcare whistleblowers found that,

> victimization at work was extensive: dismissal [], demotion [], and resignation or early retirement because of ill health related to victimization [] were common… Long term relationships broke up… and [77.9% of the children of the subjects] were adversely affected… [many whistleblowers] were prescribed long term treatment with drugs which they had not been prescribed before. Seventeen had considered suicide. Income has been reduced by three quarters or more… [and] [t]otal financial loss was estimated in the hundreds of thousands of Australian dollars…

Jean Lennane, *"Whistleblowing": A Health Issue*, 307 BMJ 667 (1993); *see also*, Lesley M. Wilkes, Kath Peters, Roslyn Weaver, & Debra Jackson, *Nurses Involved in Whistleblowing Incidents: Sequelae for Their Family*, 18 COLLEGIAN 101 at 103 (Sept. 2011) ("A major category that emerged [] was the negative effect of the whistleblowing incidents on the [whistleblowers'] family life… This [was evident in] (1) strained relationships with family members, (2) dislocation of family life and (3) exposing family to public scrutiny."). This research extends across sectors and reveals that whistleblowers in all areas experience marked and detrimental mental health effects.

TSN has witnessed this firsthand. Nearly every whistleblower TSN has supported in the seven years since it was founded either left their job as a result of or was fired due to their whistleblowing. These whistleblowers often struggle to find work in their chosen fields again and in a majority of cases have to switch careers.

11

Many whistleblowers TSN has worked with report symptoms of trauma, seek psychological support, and/or need financial assistance due in part to their inability to find work in their chosen profession, which almost always means they lose their health insurance. These findings have also been reported by the U.S. Office of the Whistleblower Ombuds, an independent nonpartisan support office that advises the House on best practices for working with whistleblowers from the public and private sectors. Office of the Whistleblower Ombuds, *Whistleblowing and Mental Health*, *available at* https://whistleblower.house.gov/sites/evo-subsites/whistleblower.house .gov/files/evo-media-document/Whistleblowing_and_Mental_Health.pdf.

These effects extend to physical health as well; multiple whistleblowers TSN has supported have suffered serious health conditions stemming from the extreme stress of whistleblowing.

The health and safety concerns pertaining to whistleblowers are directly reflected in the financial support TSN has provided to whistleblowers. Of the hundreds of thousands of dollars that TSN has contributed to whistleblowers since 2018, a significant percentage has gone towards psychological support—such as reimbursing therapists' fees—and towards assisting whistleblowers with relocation due to physical safety concerns—including stalking and other forms of retaliation. Ms. Cheung serves as one such example; when Theranos became aware she was working with the media, Ms. Cheung was stalked at her home and workplace forcing

her to hide in friends' homes and sleep on their couches out of fear for her physical safety.

Beyond these immediate impacts, whistleblowers often struggle to find work in their fields ever again having been blacklisted as a result of their revelations. For example, Ms. Cheung has not been able to find work as a scientist since she reported Theranos's wrongdoings, despite her qualifications and passion for the field. Likewise, Dr. Westrick lost his job following his disclosures, and Ms. Turner was subject to illegal retaliation, including the loss of her job.

These insights have been echoed by many government officials, such as Senator Chuck Grassley. Highlighting the harsh reality of whistleblowing and importance of rewards programs, Senator Grassley stated,

> This year, Dr. Westrick's case finally came to an end… When that happened, Dr. Westrick said: "I lost my job and career. I have no regrets. I would blow the whistle again." … When you don't listen to whistleblowers like Dr. Westrick—that's when the regrets come… [B]ecause of [Dr. Westrick's disclosures], the government recovered more than $67 million in lost funds and damages. Because of whistleblowers like Dr. Westrick, the False Claims Act is the most effective tool we have to fight government fraud. Opponents of the False Claims Act are often skeptical about its reward provisions. They assume whistleblowers are motivated by self-interest or greed, and the rewards just encourage bad behavior. But the reward programs are not about what whistleblowers gain by blowing the whistle. They're about everything the whistleblowers stand to lose. The truth is that whistleblowers are so ostracized and reviled, they suffer retaliation for speaking up. In a lot of cases, it costs them their livelihoods and their reputations. And if they get fired, they can't just go out and get another job because they've been blacklisted. So, they incur huge legal costs [and] at the same time they lose their income, maybe for a long time.

13

The whistleblower reward provisions don't just provide an incentive for them to step forward. In many cases the rewards are there to make them whole for the retaliation they suffer. It just makes sense—the government would never know all the ways it was getting ripped off without these whistleblowers. So, whatever the government recovers because of their information, whistleblowers ought to receive a share of that. That's the model behind the whistleblower programs at the Securities and Exchange Commission and at the Internal Revenue Service… Clearly, when these agencies work with whistleblowers, they succeed.

News Release, Sen. Grassley, Whistleblowers Deserve Our Profound Gratitude (July 30, 2018), *available at* https://www.grassley.senate.gov/news/news-releases/grassley-whistleblowers-deserve-our-profound-gratitude. As Senator Grassley articulates, the myriad of harms experienced by whistleblowers are readily apparent. As such, effective whistleblower support and rewards programs are crucial for combatting these harms.

## II. THE DIVISION OF ENFORCEMENT'S ENFORCEMENT MANUAL ACKNOWLEDGES THE IMPORTANCE OF THE PRESS IN THEIR MUI PROCESS WHICH DEPENDS ON ORIGINAL INFORMATION FROM WHISTLEBLOWERS.

### A. Congress's Intent Behind the Dodd-Frank Rewards Program Reveals They Understood Whistleblowers Are Not Experts in Regulatory Law.

In drafting Dodd-Frank and its rewards program, Congress was aware of both the public benefit of whistleblower disclosures as well as the significant harm these individuals suffer. Incentives like the Dodd-Frank rewards programs are meant to alleviate some of the harm whistleblowers face. More, the congressional intent behind the rewards programs, in seeking to aid whistleblowers, plainly conveys an

14

understanding that whistleblowers are not experts in U.S. regulatory law and, much more often than not, have never previously reported wrongdoing.

### B. Amici's Insights on Whistleblowers Underscores That Whistleblowers Lack Awareness of Programs Designed to Aid Them.

Most individuals who blow the whistle lack general knowledge about the protections and incentives created by Dodd-Frank and may not even be aware of Dodd-Frank's existence. This has been evident through TSN's years of work with whistleblowers, and Ms. Cheung, Dr. Westrick, and the OpenAI and Google DeepMind employees represented by Mr. Lessig serve as examples.

When whistleblowers come to TSN for help, they either directly approach the organization or are connected to TSN's Whistleblower Protection Program team through a referral from a partner organization or journalist. Since January 2023, nearly three dozen whistleblowers whom TSN supported were referred by journalists or other media contacts; this number does not include the additional dozens of whistleblowers that TSN did not have the capacity to assist during this timeframe.

TSN's work with whistleblowers has made apparent that most individuals first attempt to report wrongdoing internally; research published in 2021 revealed that 83% of whistleblowers reported internally before going to the Commission. Theo Nyreröd & Giancarlo Spagnolo, *A Fresh Look at Whistleblower Rewards* (Stockholm Institute of Transition Economics, Working Paper No. 56, June 2021). However, internal reporting often fails to address wrongdoing and exposes the

15

individuals to retaliation. This forces them to look for external avenues to blow the whistle in order to ensure the information they seek to disclose will receive the necessary attention. Because whistleblowers are often unaware of their ability to share their disclosures with regulators, many whistleblowers' next step—as TSN has witnessed and whistleblowers, including Ms. Cheung, the OpenAI and Google DeepMind whistleblowers represented by Mr. Lessig, and Dr. Westrick, have experienced firsthand—is going to the press.

>  i.  *The Firsthand Experience of Amici as Whistleblowers Reveals Unfamiliarity with the Legal System Common to Whistleblowers.*

Between 2013-2016, Theranos sold more than 1.5 million blood tests that yielded 7.8 million test results for 175,940 Arizona consumers. Press Release, AG Mark Brnovich, AG Brnovich Obtains $4.65 Million for Arizonans Who Purchased Theranos Blood Tests (Apr. 18, 2017), *available at* https://www.azag.gov/press-releases/ag-brnovich-obtains-465-million-arizonans-who-purchased-theranos-blood-tests. At trial, the prosecution estimated there was a failure rate of 51.3% for these patient results. Govt. Corr. Opp. to Mot. to Exclude Anecdotal Test Results, *U.S. v. Holmes*, 18-CR-00258 EJD (Dist. Ct. N.D. Cal. San Jose Div., Cal., Mar. 23, 2021), *available at* https://regmedia.co.uk/2021/01/12/pacer_holmes.pdf (citing Decl. of Robert Leach at 2). The full scope and ability to resolve the errors remains unknown due to Theranos's destruction of the patient database. *Id* at 2. Ms. Cheung was unaware she could blow the whistle to regulators when she first learned of

16

wrongdoing at Theranos. She was just twenty-three years old at the time of the events in question. After she was contacted by a Wall Street Journal reporter who was investigating Theranos, Ms. Cheung decided to share what she knew, despite fear for her physical safety and her concerns about the legal consequences of violating her NDA with Theranos.

As a recent college graduate, Ms. Cheung reported her concerns to the media prior to going to regulators because she saw the media as the best opportunity to shine light on the misconduct in which the company was engaged. Ms. Cheung believed time was of the essence given the impact on patients and Arizona consumers, with Theranos planning expansion to 2,000 additional patients each day; the impact on investors; the impact on employees; the impact on regulators; and the impact on public trust.

Ms. Cheung decided to take on the risks of whistleblowing because she wanted to protect the more than 175,000 patients whom she knew Theranos was defrauding, and she felt it was urgent to speak out to stunt the ongoing, potentially irrevocable harm being caused to all parties affected by Theranos's misconduct. Like most whistleblowers, Ms. Cheung was not thinking about receiving a financial reward for her information nor was she aware of the significant emotional and financial harm her whistleblowing would cause her. In fact, Ms. Cheung—like most other whistleblowers—never saw herself as a possible SEC whistleblower. Ms.

17

Cheung was simply seeking to protect the public. The process of whistleblowing thrust Ms. Cheung into ten years of legal proceedings, which she describes as nearly breaking her emotionally, financially, and mentally. After whistleblowing, Ms. Cheung had to completely rebuild her life and career; she considers herself "one of the lucky ones" to have had the capacity to do so.

Since blowing the whistle, Ms. Cheung has spoken with dozens of whistleblowers who, like her, did not know disclosing wrongdoing to regulators was an option. As someone who sits on the board of Whistleblowers of America and as an advisor to TSN, she works with whistleblowers from all backgrounds and walks of life. Through her work, Ms. Cheung has come to find that a majority of whistleblowers go to the media before contacting regulators. Her conversations with other whistleblowers further demonstrate that these individuals are motivated first and foremost by the urgent need to mitigate and address ongoing wrongdoing.

The disclosures Ms. Cheung, Ms. Turner, Ms. Watkins, Dr. Westrick, Mr. Lessig's clients, and other whistleblowers have made to the media have had a significant impact on the public. They have resulted in billions of dollars recovered for investors, key changes in policy, and prevented and/or addressed harm done to hundreds of thousands, if not millions, of people. Moreso, Ms. Cheung's disclosures were a direct catalyst for the FDA to begin drafting long-overdue legislation to regulate laboratory testing, which was introduced to the House as the VALID Act in

2023. VALID Act of 2023, H.R. 2369, 118th Cong (2023). The VALID Act modernizes the regulation of laboratory testing and is an essential step in ensuring patients have access to accurate, reliable diagnostic testing. *Id*.

The disclosures that whistleblowers, such as Ms. Cheung, Ms. Turner, Ms. Watkins, Dr. Westrick, and Mr. Lessig's clients, have come forward with have been made at their own expense, resulting in loss of employment and blacklisting from the professions to which they have dedicated their lives. However, the impacts of their revelations are far-reaching and critical. Ms. Cheung, Ms. Turner, Ms. Watkins, Dr. Westrick, and Mr. Lessig's clients know whistleblowers are protectors of patients, consumers, investors, the larger public, the environment, and institutions that many hold near and dear; they believe it would be a grave failure to overlook whistleblowers' primary way of disclosure—historically and in the present moment. Whistleblowing is one of the most effective mechanisms in the American system to preserve public-interest and accountability, and it would be a misstep to turn away from the critical role the media plays in this process.

**C. The Enforcement Manual Instructs Staff to Rely on Investigative Journalists and, Thus, on Information Disclosed by Whistleblowers, Who Are Therefore Essential to the Commission's Ability to Properly Investigate Wrongdoing.**

Despite §2.3.1 of the Commission's Enforcement Manual directing staff to review media as part of their investigatory process to identify companies violating U.S. laws and regulations, the Commission has failed to uphold the congressional

intent behind Dodd-Frank by ignoring the sources of this information. §2.3.1 of the Commission's Enforcement Manual states,

> The Division receives information from a variety of sources that may warrant the opening of a new MUI, *including newspaper articles*, complaints from the public, whistleblowers, and referrals from other agencies or SROs. Assigned staff are encouraged to use their discretion and judgment in making the preliminary determination of whether it is appropriate to open a MUI.

SEC Enforcement Manual §2.3.1, Division of Enforcement Office of Chief Counsel (Nov. 28, 2017) (emphasis added). This section explicitly directs the Commission's enforcement staff to use the media as one means to open investigations. However, data collected by the Organisation for Economic Co-operation and Development ("OECD") reveals just how critical a role the media plays in Commission's Matter Under Inquiry ("MUI") process. *The Role of the Media and Investigative Journalism in Combating Corruption*, OECD (2018); *see also*, *Anti-Corruption and Integrity Outlook 2024*, OECD (2024). OECD's 2018 report found that "whistleblowers are often the first source of information for journalists reporting on corruption stories." *The Role of the Media* at 8. OECD expands on this, stating,

> Whistleblowers turn to journalists for various reasons including to protect their identity, to bring issues of concern to the attention of the public or government, or in the absence of effective responses by law enforcement or employers. One journalist noted that reporting to the media can be more effective for a whistleblower than reporting to law enforcement. While criminal proceedings can take years to reach a conclusion, a journalist can draft and publish a story within days that can reach a global readership through social media platforms. New technology means that journalists can communicate with their sources

20

> via encrypted communication platforms (e.g. Signal), which can protect the whistleblower's identity.

*Id*. The OECD's research reveals just how critical the media is in order for the Commission to hold corporations accountable and unveil ongoing misconduct that harms investors and the public alike.

Like in the present case, if this Court and the Commission were to consider only the media's role in their investigatory process, the true weight of the whistleblowers' actions would be ignored. This would be a critical oversight which would both punish current whistleblowers—such as Doe—and create a chilling effect on future whistleblowers, who as result of the Commission's ruling may choose to not come forward, ultimately hindering the Commission's own goals and working against the original intent of Dodd-Frank.

The information in many of the cases stemming from media revelations in 2018 likely originated from whistleblowers. The likelihood of media information stemming from industry-insider information greatly increases within the context of prominent corporate industries, such "Big Tech," "Big Pharma," major financial institutions, to name a few. Because some of these fields remain largely unregulated, almost all disclosures of wrongdoing from this industry are thanks to whistleblowers. In this case, the Commission would not have been able to impose sanctions if Doe— an insider to the relevant industry—has not made disclosures to the media.

The ability to rely on the media can only exist where sources are willing to risk their safety and wellbeing for the good of the public and investors. Without acknowledging this, the Commission and their rules fall out of line with Dodd-Frank and must be amended. Conversely, to abide by §2.3.1 of the Commission's Enforcement Manual should necessarily require understanding by the Commission that whistleblowers, like Doe, who first go to the media before disclosing to regulators are both the original source and have voluntarily reported such information.

As TSN and individual amici have seen, or experienced firsthand, the natural trajectory most whistleblowers take is to first contact the media. Their lack of knowledge of regulatory law and the procedures in place to help them disclose their revelations result in the vast majority of whistleblowers believing the only way, and the best way, to safeguard the public is to make the information public by working with the media. This is an even larger factor for international whistleblowers who are further removed from U.S. laws and in almost every case have no background in or informed knowledge of the Commission's role in regulations and public protection, let alone the existence of Dodd-Frank. Amici's work with whistleblowers reveals that whistleblowers are not experts in whistleblower laws: they are regular citizens of the U.S. and other countries merely looking to protect investors and the public from corporate wrongdoing. Dodd-Frank was created to aid whistleblowers,

and the Commission should not rely on semantic and improperly analyzed arguments to deny the much needed, and well-deserved, benefits to whistleblowers who put the public's wellbeing before their own. It would be inconsistent to allow the Commission to, by their own policy, rely on media while simultaneously claiming a whistleblower is not the "original source" of the same information they are relying on. Because whistleblower disclosures give rise to the media the enforcement staff is accessing in the MUI processes, it is against common sense to subsequently claim the whistleblower is not the "original source" and has not "voluntarily" produced said information.

## III. DOE MEETS THE REQUIREMENTS FOR A §36(A) WAIVER BECAUSE THE EXEMPTION IS NECESSARY FOR THE PUBLIC INTEREST AND THE PROTECTION OF INVESTORS.

Should the Court find that the Commission has correctly applied the definitions of "original source" and "voluntarily" in this specific case, the Court should still find in favor of Doe due to the Commission's General Exemptive Authority under §36(a) of the Securities Exchange Act ("SEA") of 1934. 15 U.S.C. §78(a)(1). §36(a)(1) of SEA states,

> … [T]he Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this title or of any rule or regulation thereunder, *to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors*.

23

*Id*. (emphasis added). Thus, in order for a whistleblower to qualify for the §36(a)(1) exemption, the Commission must find the whistleblower's disclosure was (1) in the public's interest and (2) in investors' interests. *Id*. The Commission's failure to properly analyze their denial here is inconsistent with past precedent and against the interests of justice. Thus, the rejection of Doe's waiver request falls severely out of line with Commission's precedent.

While it is plainly apparent that Doe meets the statutory requirements to qualify for a §36(a) waiver, it is equally important to consider the impact a rejection of Doe's waiver request would have on future whistleblowers. As amici have seen through extensive work with and support of whistleblowers across many sectors, whistleblowers nearly always face extensive harm as a result of their disclosures. Due to this, whistleblowers are often unsure if they want to come forward with the information they are privy to. These whistleblowers recognize the risks they face should they choose to blow the whistle; many whistleblowers are not in a financial position to risk their jobs and livelihoods. These whistleblowers are thinking not only of the financial implications for themselves but the effects on their spouses, children, and other loved ones. Congress was aware of the risks whistleblowers often face when they created Dodd-Frank; in fact, it is clear that Dodd-Frank seeks to minimize the burdens which result from blowing the whistle.

24

Denying Doe a waiver request here, and creating harmful precedent, will have the unintended consequence of reinforcing the preconceived notions many whistleblowers share about the government and its support, or lack thereof, of whistleblowers. Whistleblowers often believe they are on their own; they do not trust that the government will care about their interests or be willing to help them. Denying Doe a waiver will reinforce these existing perceptions of the government and regulatory bodies supposedly designed to aid whistleblowers. This is especially true when considering the unprecedent impact Doe's whistleblowing has had and the substantial fine sanctioned against the corporation involved.

If the Commission's Final Order stands, future whistleblowers will look to this case, one of significant size and impact, and see that the Commission failed to protect the individual responsible for bringing forth the disclosures. This will almost certainly disincentive these future "smaller" whistleblowers, thus creating a chilling effect that ultimately harms the Commission, investors, and the American public as a whole.

Doe risked his/her physical safety and career to make the American public and the corporation's investors better off. Doe meets the requirements for a §36(a) waiver and to uphold the Commission's denial would be at odds with the Commission's own precedent in this area. Importantly, denying Doe a waiver would have much larger consequences than in this case alone. The Commission and this Court must

25

take a second look and waive the requirements here if they choose not to find that Doe has met the requirements for award eligibility, and the denial of this award is directly at odds with the best interest of the public and the best interest of investors. The Commission, and this Court, should not punish Doe for his/her failure to understand intricate, complicated processes of U.S. regulatory law and instead should uphold the intent and purpose of Dodd-Frank, which only serves to benefit the Commission and the U.S. more largely. A decision against Doe will have a strong chilling effect on whistleblowers who may consider coming forward in the future and may, following this decision and with the understanding that the Commission does not work towards their best interest and protections, disincentivize them from disclosing wrongdoing in the first place.

## **CONCLUSION**

As demonstrated by TSN's work supporting numerous whistleblowers who have been responsible for corporate accountability at companies including Meta, Uber, and X (formerly Twitter), TSN has witnessed firsthand how impactful the Court's ruling will be. Through working with whistleblowers, and experiences as whistleblowers, amici are able to foresee that a ruling against Doe will not only be harmful to whistleblowers but, ultimately, to the Commission and the U.S. more largely. Amici urge the Court to overturn the Commission's nonsensical reading of Dodd-Frank and uphold a reading consistent with the Act itself—one that is in line

with Congress's original intent. Accordingly, for the reasons set forth in Doe's brief, the Court should overturn the Commission's Final Order. Doe's revelations meets the requirements for an original source voluntarily sharing info with the Commission and allowing them to withhold this reward would not only create dangerous and harmful precedent for future whistleblowers but would be inconsistent with the law as Congress wrote it and the Commission has previously interpreted it.

DATED: December 3rd, 2024

Respectfully submitted,

By: /s/ Margaux Ewen
Margaux Ewen
The Signals Network
268 Bush St #4216,
San Francisco, CA 94104
(917) 213-3028

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume of 6,500 words under Fed. R. App. P. 29(a)(5) because it contains 6,404 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

/s/ Margaux Ewen
Margaux Ewen

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this third day of December 2024, I electronically filed a true and correct copy the foregoing amici brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served via the appellate CM/ECF system.

/s/ Margaux Ewen
Margaux Ewen

*Counsel for Amici Curiae*